IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HAMPTON BERMUDA LTD., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-3074 |
| | § | |
| M/V STAR SIRANGER, <u>in rem</u>, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.** *The Court's Findings and Analysis*

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court, having reviewed the documentary evidence as well as the parties' post-trial submissions, makes the following findings of fact and conclusions of law.

**A.** *Findings of Fact*

1. On February 8, 2005, Sea Bridge Projects, Inc. ("Sea Bridge") time-chartered the *STAR SIRANGER* for a period of between 110 to 140 days pursuant to a New York Produce Exchange standard form time charter party. *See* Joint Exh. 1.

2. The charter party contained an industry-standard "prohibition of liens" clause, which provided:

> Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agent, which might have priority over the title and interest of the owners of the vessel.

*See id.*, at Clause 18:112-113.

3. Sea Bridge arranged to have the *STAR SIRANGER* call on the Port of Savannah, Georgia, in June 2005. *See* Joint Exh. 2, at 16:16-17:16.

4. On June 24, 2005, Dan Yeager ("Yeager") from Sea Bridge contacted Hampton Bunkering, Ltd. ("Hampton Bunkering") by telephone to procure fuel bunkers for the *STAR SIRANGER* while it docked in Savannah. *See* Joint Exh. 2, at 16:16-17:16. Yeager spoke with Susan Cox ("Cox"), the broker for Hampton Bunkering. *See id.*, at 5:1-4. Cox had no affiliation with Hampton Bermuda, Ltd. ("Hampton Bermuda"). *See id*.

5. Hampton Bermuda and Hampton Bunkering are two separate and distinct companies. *See* Joint Exh. 18.

6. Hampton Bunkering, a Canadian Corporation, is a fuel broker. *See* Joint Exh. 9, at 6:4-7, 6:19-21; *see also* Joint Exh. 2, at 14:25 and 44:4-5. Hampton Bermuda, a company incorporated and located in Bermuda, is a trader. *See* Joint Exh. 9, at 6:8-18; *see also* Joint Exh. 2, at 14:25-15:2.

7. Hampton Bunkering does not exclusively broker for Hampton Bermuda. *See* Joint Exh. 9, at 31:5-14.

8. Hampton Bunkering did not disclose to Sea Bridge any relationship it may have had with Hampton Bermuda. *See* Joint Exh. 9, at 32:15-18.

9. After her conversation with Yeager, Cox sent an e-mail to Colonial Oil Industries, Inc. ("Colonial Oil"), a physical supplier of bunker fuel, to obtain quotes for bunkers for the *STAR SIRANGER*. *See* Joint Exh. 2, at 21:7-21; *see also* Joint Exh. 4. The e-mail does not mention Hampton Bermuda. *See id*.

10. Within an hour, Colonial Oil sent a return e-mail to Hampton Bunkering with prices for the requested bunkers. *See* Joint Exh. 4. The e-mail from Colonial Oil provided that the earliest that the bunkers could be delivered was June 27, 2005. *See id*.

11. Cox advised Sea Bridge of the quoted Bunker prices, which Sea Bridge accepted. *See* Joint Exh. 2, at 25:18-26:4.

12. Cox sent an e-mail to Colonial Oil confirming the order for bunkers. The communication indicates that the transaction is "a go." *See* Joint Exh. 5.

13. Hampton Bunkering then sent "Bunker Nomination Confirmation" e-mails to both Colonial Oil and Sea Bridge. *See* Joint Exh. 2, at exh. 4b; *see also* Joint Exh. 6.

> As per instructions received from buyer, and on their behalf, we have placed following nomination for bunkers in accordance with physical suppliers' normal terms and conditions which have been herewith fully accepted without reservation by buyers. Additional copies are available upon request.

*See id*. The e-mail goes on to reference the following:

| | |
|---|---|
| Vessel: | MV Star Siranger- IMO #9000314 |
| Buyer: | Owners/Operators/Master and/or Sea Bridge Projects Inc. |
| Seller: | Hampton Bermuda Ltd. |
| Supplier: | Colonial Oil |
| Port: | Savannah |
| Date: | June 26/27 |

*See id*. At the bottom of the e-mail was an admonishment:

> No disclaimer stamp of any type or form will be accepted on the bunker receipt, nor, should any stamp be applied, will it alter, change or waive the seller's maritime lien against the vessel, or waive the vessel's ultimate responsibility for the debt incurred through this transaction.
>
> Supply to be closely coordinated with local agents. Demurrage, downgrading, pumpback, detention, overtime, taxes and any other applicable charges for buyer's account. The details of this nomination are being sent to buyer and supplier, any errors or omissions should be reported by either party immediately.

*See id*. This is the first time that Hampton Bermuda is mentioned in connection with the transaction.

14. The Bunker Nomination Confirmation e-mail sent to Sea Bridge requested that Sea Bridge "please confirm receipt of this e-mail." *See* Joint Exh. 6. Hampton Bunkering did

3

not receive a response from Sea Bridge to this e-mail. *See* Joint Exh. 2, at 26:5-20. There is no evidence that Sea Bridge received Hampton Bunkering's "Bunker Nomination Confirmation" e-mail.

15. There were no written or oral communications between Hampton Bermuda and Sea Bridge in connection with the supply of bunkers to the *STAR SIRANGER*. *See* Joint Exh. 2, at 20:12-16, 64:14-17.

16. There is no evidence of any written or oral communications between Hampton Bunkering and Hampton Bermuda in connection with the supply of bunkers to the *STAR SIRANGER*. *See* Joint Exh. 2, at 51:19-52:1.

17. Sylvia Kartanowicz, President of Hampton Bunkering, authorized the transaction with Sea Bridge. *See* Joint Exh. 2, at 58:12-22, 12:22-23. Additionally, the transaction was approved by Christopher Hampton-Davies as "owner of Hampton Bunkering." *See* Joint Exh. 9, at 9:18-10:6.

18. Sea Bridge and Hampton Bunkering had done business together on numerous previous occasions (15-20 times), and Sea Bridge had always paid its invoices. *See* Joint Exh. 2, at 27:6-19; 28:2-5. Hampton Bunkering did not know what relationship, if any, Sea Bridge had with the *STAR SIRANGER*; however, Hampton Bunkering still extended credit to Sea Bridge on a 45 day term on the transaction at issue. *See* Joint Exh. 2, at 28:2-10, 55:19-56:1, 59:25-60:13.

19. In anticipation of the vessel's arrival, Andreas Haukaas ("Haukaas") (who is located at Star Shipping's head office in Norway) sent an e-mail to Don Walden ("Walden") (who is an Assistant Agency Manager for Star Shipping in Savannah, Georgia) instructing him to advise "Seabridge's agents and other suppliers of the services to the vessel" of the prohibition of liens clause in the charter party. *See* Joint Exh. 10, at 15:20-16:3; *see also* Joint Exh. 11.

20. On June 23, 2005, Walden forwarded Haukaas' e-mail to Sea Bridge's local agent, Wilmington Shipping, and requested that the "no-lien clause" be made known to all vendors associated with the vessel's upcoming call in the port of Savannah. *See* Joint Exh. 11.

21. Wilmington advised Walden that Colonial Oil would be supplying fuel to the vessel. *See* Joint Exh. 12.

22. On June 27, 2005, at 8:07 a.m., Walden contacted by e-mail Gary Gale ("Gale") at Colonial Terminals and provided notice of the "no-lien clause" in the Sea Bridge charter party for the *STAR SIRANGER*. *See* Joint Exh. 10, at 25:17-18; *see also*, Joint Exh. 13. Gale was in charge of delivering the bunkers that are the basis of this action. *See* Joint Exh. 15, at 18-20. Colonial Terminals and Colonial Oil are divisions of the Colonial Group. *See id.*, at 46:6-20.

23. On June 27, 2005, at 9:36 a.m., Gale confirmed receipt of Walden's e-mail and advised that the bunkers were to be delivered that day at 1300 hours. *See* Joint Exh. 13. According to the bunker receipts, Colonial Oil commenced pumping at 1335 hours. *See* Joint Exh. 8. The Colonial bunker receipt references "Account: Hampton." *See id*.

24. Colonial Oil acted as an independent contractor. The only duties of the parties were those set forth in Colonial's Terms and Conditions. *See* Joint Exh. 16. A Colonial representative, Keith Hill ("Hill"), testified in his deposition that the relationship between Hampton Bermuda and Colonial was nothing more than an "arms length" relationship and confirmed that transactions between Colonial and Hampton were strictly on a buy/sell basis. *See* Joint Exh. 15, at 19. There was no relationship other than buyer and seller between Colonial and Hampton Bermuda.

25. The President of Hampton Bermuda, Christopher Hampton-Davies ("Hampton-Davies") testified at his deposition that there is no protocol regarding no lien provisions

5

and communication of their existence by the physical supplier to the fuel broker. *See* Joint Exh. 9, at 15. Hampton-Davies stated that there was no written or oral agreement to pass on the no lien provision information to either party. *See id*. He stated that he would "expect them to pass the notice," and acknowledged that passing along the information regarding the no lien provision is merely "[g]ood business practice." *See id.*

26. There are about 400 to 500 fuel brokers in the world. *See* Joint Exh. 2, at 45:24-46:3. There are about 100 traders worldwide. *See* Joint Exh. 9, at 27:10-18.

27. Walden, representing *STAR SIRANGER* in Savannah, would have had no knowledge that a bunker broker would be involved in a transaction between a charterer and a physical supplier of bunkers. *See* Joint Exh. 10, at 9:10-14. Walden had no knowledge that any Hampton entity was involved in providing bunkers to the *STAR SIRANGER*. *See* Joint Exh. 14, at 9.

28. Colonial Oil subsequently billed Hampton Bermuda at the Hampton Bunkering address in Canada for the bunkers by invoice in the amount of $108,186.94. *See* Joint Exh. 17. On July 4, 2005, Hampton Bunkering sent an invoice to Sea Bridge in the amount of $111,251.47 for the bunkers that it had previously purchased from Colonial; however, Sea Bridge has failed to pay Hampton Bunkering. *See* Joint Exh. 7.

29. On September 1, 2005, Hampton Bermuda filed this case, and the *STAR SIRANGER* was arrested by the United States Marshal in Houston, Texas. An *in rem* bond/Letter of Undertaking was posted to substitute for the vessel in order to release the vessel from arrest. *See* Docket Entry Nos. 1, 2, 4, 5.

30. A review of all of the evidence reveals that Hampton Bermuda has not shown that the bunkers at issue were reasonably priced. There is no evidence demonstrating that the charges for the bunkers were reasonable in accord with industry standards.

31. Hampton Bermuda has not shown that the bunkers were provided at the direction of the vessel's owner or agent. There is no evidence demonstrating that the owners of the vessel had a relationship with Hampton Bermuda or authorized Hampton Bermuda to act on behalf of the owners of the vessel.

32. The evidence demonstrates that the charter party, Sea Bridge, procured bunkers through fuel broker Hampton Bunkering, and physically received the bunkers from independent contractor Colonial Oil. The evidence fails to demonstrate that Sea Bridge knew Hampton Bermuda was involved in the bunker transaction. Instead, it appears that Hampton Bunkering unilaterally made the decision to involve Hampton Bermuda, not at any request from Sea Bridge.

33. Hampton Bermuda was not authorized to provide necessaries to the vessel.

34. Hampton Bermuda has failed to prove that it is entitled to a maritime lien against *STAR SIRANGER*.

B. *Conclusions of Law*

1. Jurisdiction over admiralty and maritime matters exists pursuant to 28 U.S.C. § 1333, and is invoked under Rule 9(h) of the Federal Rules of Civil Procedure.

2. In civil cases, the burden of proof is the same regardless of whether the finder of fact is a judge in a bench trial or a jury. *See Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir.), *cert. denied*, 513 U.S. 876 (1994). Plaintiff bears the burden of satisfying the finder of fact that it

has proven every element of its claim by a preponderance of evidence. *See Sandoval v. Hogan*, 7 F. Supp. 2d 1234, 1245 (M.D. Ala. 1998), *aff'd*, 197 F.3d 484 (11th Cir. 1999), *rev'd on other grounds*, 532 U.S. 275 (2001). A preponderance of the evidence means "the greater weight and degree of credible evidence" that demonstrates that a claim is "more likely so than not so." *Pattern Jury Instructions*, General Instructions for Charge 3.1, United States Court of Appeals for the Fifth Judicial Circuit (Civil Cases) (2006).

        3.     "In bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law." *Sandoval*, 7 F. Supp. 2d at 1245 (citing *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993)).

        4.     This case is an *in rem* admiralty action concerning fuel supplied to the *M/V STAR SIRANGER* at the port of Savannah, Georgia. Hampton Bermuda seeks a maritime lien against the vessel pursuant to the Maritime Commercial Instruments and Liens Act ("the Act" or "MCILA"). *See* 46 U.S.C. § 31342(a). The parties agree that fuel is a necessary under the Act.

        5.     To establish a maritime lien, Hampton Bermuda must demonstrate: (1) it provided "necessaries" (2) at a reasonable price (3) to the vessel (4) at the direction of the vessel's owner or agent. *See* 46 U.S.C. § 31342; *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005).

        6.     The "reasonable price" requirement is determined by whether the charges are "customary" and "in accord with prevailing charges for the work done and the materials furnished." *See Sweet Pea Marine, Ltd.*, 411 F.3d at 1249. A plaintiff must present "some modicum of evidence which compares the charges claimed with what other competitors would have charged for similar

work or materials." *Id.* Here, Hampton Bermuda has failed to present any evidence concerning the reasonableness of charges. As such, Hampton Bermuda cannot prevail on this element of its maritime lien claim. *See id.* (citing *TTT Stevedores of Tex., Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135, 1141 (5th Cir. 1983)).

7. There is no documentary evidence showing that Hampton Bermuda paid Colonial Oil for the fuel that was provided to the *STAR SIRANGER*; thus, Hampton Bermuda has not shown that it is entitled to recover damages from the vessel on this basis.

8. A plaintiff claiming a maritime lien for supplying necessaries must prove that it received authority from an entity with power to bind the vessel. *See* 46 U.S.C. § 31342; *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1245-46 (11th Cir. 1999). A charterer is authorized under the statute to bind a vessel for necessaries. 46 U.S.C. § 31341(a)(4)(B). Receiving authority from third parties is insufficient to bind the vessel. *See Galehead, Inc.*, 183 F.2d at 1245-46.

9. Hampton Bermuda had not presented evidence that it was authorized to provide bunkers to the *STAR SIRANGER* by any entity with authority to bind the vessel. To the contrary, the evidence establishes that Sea Bridge authorized Hampton Bunkering, a separate and distinct entity from Hampton Bermuda, to provide bunkers to *STAR SIRANGER*. To the extent that Hampton Bunkering authorized Hampton Bermuda's involvement in the transaction, that authorization would not be sufficient to create a maritime lien in favor of Hampton Bermuda. *See Galehead*, 183 F.3d at 1245-46; *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 224 (5th Cir. 1999), *cert. denied*, 529 U.S. 1130 (2000).

10. Although maritime law in the United States embraces the principles of agency, Hampton Bermuda cannot and has not demonstrated that Hampton Bunkering was acting as its agent

for purposes of providing bunkers to the *STAR SIRANGER*. *See Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1105, 1111 (5th Cir. 1985). In order to establish an agency relationship, there must be actual or apparent authority granted by the principal to the agent. *See Armit v. Eleni Int'l Shipping, S.A.*, 201 F.3d 556, 559 (5th Cir. 2000). Apparent authority is created by conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to the acts done on his behalf by the person purporting to act form him. *See Cactus Pipe & Supply Co.*, 756 F.2d at 1111. An agent cannot confer authority upon himself. *See id*.

11. Hampton Bermuda has not shown that Hampton Bunkering had actual or apparent authority on Hampton Bermuda's behalf to provide bunkers to the *STAR SIRANGER*. There is no evidence in the record revealing any communication between Hampton Bermuda and Hampton Bunkering in connection with the transaction at issue. Although Hampton Bermuda is referenced on the "Bunker Nomination Confirmation" e-mails after the order was complete, this is insufficient to clothe Hampton Bunkering with apparent authority. Moreover, Hampton Bermuda had no direct communication with Sea Bridge regarding the transaction. Hampton Bunkering cannot confer authority upon itself. *See Cactus Pipe & Supply Co.*, 756 F.2d at 1111.

12. Alternatively, notice to a supplier of necessaries of a "no-lien provision" will waive the claimant's right to a maritime lien. *See Stevens Shipping & Terminal Co. v. Japan Rainbow, II MV*, 334 F.3d 439, 443 (5th Cir. 2003). Actual notice must be given to the supplier of the necessary, or to another entity in the supply chain known to the vessel owner. *See Gulf Oil Trading Co. v. M/V Caribe Mar*, 757 F.2d 743, 750-51 (5th Cir. 1985). On the facts presented to the Court at trial, the vessel provided actual notice of the "no-lien clause" to Colonial Oil, the physical supplier of the bunkers. Although Colonial Oil served as an independent contract to

Hampton Bermuda, it is undisputed that the vessel had no knowledge of any other fuel supplier involved in the transaction, including any Hampton entity. Because the trial evidence indicates that there are 400-500 brokers and over 100 traders worldwide, it would be unreasonable to require *STAR SIRANGER* to guess that any Hampton entity was involved in the supply chain. *STAR SIRANGER* gave notice of the "no-lien clause" to the only entity known by the vessel to be involved in the transaction–*i.e.*, Colonial Oil. *STAR SIRANGER* should not be penalized for lack of contractual obligations between Hampton Bermuda and Colonial Oil and/or Colonial Oil's failure to adhere to "good business practice." Under these circumstances, the Court finds that *STAR SIRANGER'S* notice to Colonial Oil of the "no-lien clause" is sufficient to preclude Hampton Bermuda's maritime lien claim.

        13.    Any conclusion of law more properly characterized as a finding of fact is hereby adopted as such. Similarly, any finding of fact more properly characterized as a conclusion of law is hereby adopted as such. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

**II.**    *Conclusion*

For the foregoing reasons, the Court concludes that Plaintiff Hampton Bermuda has failed to show that it is entitled to an admiralty and maritime lien and that *STAR SIRANGER* is entitled to a take nothing judgment against Hampton Bermuda. Any Letter of Undertaking in favor of Hampton Bermuda is released.

It is so ORDERED.

**SIGNED** at Houston, Texas on this the 18th day of April, 2008.

Calvin Botley
United States Magistrate Judge